UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/2/19

A.L.M., a minor, by and through her Parent and
Guardian, Scott M. Moore, and SCOTT M. MOORE,
individually,

                                  Plaintiffs,

        -against-

BOARD OF MANAGERS of the Vireum
Schoolhouse Condominium,

                                  Defendant.

No. 17-cv-07385 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

Plaintiffs A.L.M. and Scott M. Moore ("Moore") (collectively, "Plaintiffs") bring this action against the Board of Managers of the Vireum Schoolhouse Condominium ("Defendant" or the "Board") asserting claims under the Civil Rights Act, 42 U.S.C. §§ 1981, 1982, and the Fair Housing Act, *id.* § 3617. (Compl., ECF No. 1.) Plaintiffs allege "a continuing pattern of purposeful acts of discrimination by the Board and its agent, John Mulazzi ("Mulazzi"), based on A.L.M.'s race, age, sex, and national origin" designed to drive Plaintiffs out of their home and to keep Plaintiffs from leasing or selling their home. (*Id.* ¶ 1.)

Before the Court is Defendant's Motion for Summary Judgment (ECF No. 25), Plaintiff's Cross-Motion for Summary Judgment (ECF No. 50), and Defendant's Motion for Sanctions (ECF No. 31). Upon the conclusions set forth below, Defendant's Motion for Summary Judgment is GRANTED, Plaintiff's Cross-Motion for Summary Judgment is DENIED, and Defendant's

Motion for Sanctions is DENIED.

## BACKGROUND

The following facts are drawn from the parties' Rule 56.1 statements, affidavits, declarations, and exhibits, and are not in dispute unless otherwise noted.

In 2004, Moore and his wife, Marilisa Moore, adopted A.L.M., a female of Chinese race and national origin. (*See* Plaintiffs' Rule 56.1 Statement ("Pls.' Statement") ¶¶ 1-2 & Ex. 1, ECF No. 51.)

In the spring of 2005, Moore purchased a unit (the "Moore Unit") in the Vireum Schoolhouse Condominium (the "Vireum") in Ossining, New York. (Pls.' Statement ¶ 15; *id.* Ex. 4; Defendant's Rule 56.1 Statement ("Def.'s Statement") ¶ 3, ECF No. 27-1; Declaration of William H. Bave, Jr. in Support of Defendant's Motion for Summary Judgment ("Bave Decl.") Ex. D ("S. Moore Dep. Tr.") 7:19-8:4, ECF No. 26-4.) [1]

The Moore Unit is located on the ground floor of the Vireum and is accessible only from an outside door, *i.e.*, is not accessible from inside the Vireum. (Pls.' Statement ¶ 21; Declaration of John Fox in Support of Plaintiffs' Cross-Motion for Summary Judgment ("Fox Decl.") ¶ 5, ECF No. 52.) [2] The door to the Moore Unit opens to a brick enclosed terrace, with a matching brick sidewalk (the "Moore Unit Sidewalk") leading directly from the brick terrace to a public sidewalk. (*See id.*; Def.'s Statement ¶ 4; Bave Decl. Ex. K, ECF No. 26-11) The public sidewalk leads to

---

[1] Excerpts of Moore's deposition transcript were also provided by Plaintiffs. (*See* Pls.' Statement Exs. 5-7 & 21, ECF Nos. 51-5-7 & 51-21.)
[2] A copy of this declaration was also submitted as an exhibit to Plaintiffs' Rule 56.1 Statement of Facts. (*See* Pls.' Statement Ex. 8, ECF No. 51-8.)

Vireum's east parking lot and a public street known as Snowden Avenue. (*See* Pls.' Statement ¶ 21; Fox Decl. ¶ 5; Bave Decl. Ex. L, ECF No. 26-12.)

At all relevant times, Mulazzi resided in Unit 1C of the Vireum (the "Mulazzi Unit"). (*See* Pls.' Statement ¶¶ 25-26; Def.'s Statement ¶ 6; Bave Decl. Ex. M, ECF No. 26-13; *id.* Ex. T (Affidavit of John Mulazzi ("Mulazzi Aff.")) ¶ 2, ECF No. 26-20.) The Mulazzi Unit was located directly above the Moore Unit and has windows on three sides, with one side looking down over the entrance of the Moore Unit, the second side facing the Moore Sidewalk, and the third side facing Vireum's east parking lot. (*See* Pls.' Statement ¶ 25; Fox Decl. ¶ 9; Bave Decl. Ex. M.)

Moore, his wife, and A.L.M. first moved into the Moore Unit in April 2005 (Def.'s Statement ¶ 2; S. Moore Dep. Tr. 8:25-9:8). According to Moore, the day he and his family moved in, Mulazzi "looked at [A.L.M.]," "screwed up his face, [and] looked at [the Moores] as a mixed race family." (Pls.' Statement ¶ 48; S. Moore. Dep. Tr. 87:6-10.)

Moore was elected to the Board in September 2005. (Def.'s Statement ¶ 7; S. Moore Dep. Tr. 28:15-20; Pls.' Statement ¶ 55.) At various times relevant to this case, the Board included the following members, among others: Mulazzi; Patrick Ryan ("Ryan"); and Duncan Kennedy ("Kennedy"). (*See* Pls.' Statement ¶¶ 3, 5, 7, 9, 11; Pls.' Statement Ex. 3 ("Def.'s Resp. Pls.' First Req. for Admis.") at 1-2) Ryan and Mulazzi both knew that A.L.M. was a female child of Chinese or Asian race who resided in the Moore Unit. (*See* Pls.' Statement ¶¶ 4, 6, 8, 10, 12; Def.'s Resp. Pls.' First Req. for Admis. at 2.)

Moore testified during his deposition that, at some point in 2005, he and other members of the Board went to each unit to "check the locks" and ensure it had keys to all of the units (Pls.'

Statement ¶ 48; S. Moore Dep. Tr. 87:19-23) According to Moore, A.L.M. was with him at the time and Mulazzi gave her a "nasty sneer" upon their arrival to the Mulazzi Unit. (Pls.' Statement ¶ 48; S. Moore Dep. Tr. 87:23-88:4.)

Moore's Board membership ended in the fall of 2006. (*See* Def.'s Statement ¶ 8; S. Moore Dep. Tr. 30:16-9; Pls.' Statement ¶ 55.) According to Defendant, Moore's departure from the Board occurred because Mulazzi and another Board member organized a vote at the annual meeting to vote Moore off the Board. (Def.'s Statement ¶ 8.) Plaintiff, for his part, notes that the minutes from an August 16, 2006 Board meeting reflect that Moore stated to the Board that "he may not stand for election in September 2006 and encouraged the new board [to] continue the momentum." (Pls.' Statement ¶ 55; *id.* Ex. 23.)

In the spring of 2010, Moore hired a private investigator named John Fox ("Fox") to look into certain instances of harassment and other difficulties that the Moores were experiencing while living at Vireum.[3] (*See* Pls.' Statement ¶ 19; Fox Decl. ¶ 3; S. Moore Dep. Tr. 39:4-40:4.) As part of this engagement, Fox learned that the Moores had experienced excessive noise coming from the floor of the Mulazzi Unit into the Moore Unit, as well as damage to some of their personal property, including their car and packages they had delivered to Vireum's mailroom. (*See* Pls.' Statement ¶ 20; Fox Decl. ¶¶ 4, 9.) Fox found that no packages in the mailroom were being damaged except those addressed to the Moores, and that the only time the Moores' packages were not being damaged was when Fox was in the vicinity to observe. (Pls.' Statement ¶ 20; Fox Decl. ¶¶ 4, 8.)

---

[3] Plaintiff never received a written report from Fox as to his investigation in findings (Def.'s Counterstatement ¶ 3; S. Moore Decl. 42:6-9), but a declaration to that end was submitted by Fox in connection with Plaintiffs' Motion for Summary Judgment (Fox Decl., ECF No. 52). Nor does the Court agree with Defendant that the declaration constitutes inadmissible speculation.

Fox also learned about incidents involving another Vireum resident, Thomas Elders ("Elders"), in which Elders would interfere with the Moores' ability to walk to or from the Moore Unit, their car, A.L.M.'s school bus, or a nearby park. (Pls.' Statement ¶ 20; Fox Decl. ¶ 4). In particular, Fox learned that whenever the Moores would walk to or from these places, Elders would appear and "intersect" them, *i.e.*, approach them in such a way that they would physically collide with Elders unless they stopped walking or changed their direction (the "intersecting behavior"). (*Id.*) This intersecting behavior occurred both day and night, and was often accompanied by a noise to attract attention, such as the jingling of keys, whistling, or coughing. (*Id.*) Furthermore, the Moore Family was unable to avoid these interactions with Elders by making changes to their routine because Elders would adapt the timing of his intersecting behavior in accordance with any changes the Moores would make to their routine. (Pls.' Statement ¶ 20; Fox Decl. ¶¶ 4, 7.) Fox learned that Elders lived in Unit 2B, which did not have any windows overlooking the door to the Moore Unit, its terrace, or the sidewalk leading from its terrace. (Pls.' Statement ¶ 22; Fox Decl. ¶ 6.)

In light of the foregoing discoveries, Fox began to investigate whether any other Vireum residents were assisting Elders with his harassment. (Pls.' Statement ¶¶ 22-23; Fox Decl. ¶¶ 7-8.) Fox eventually learned that the Mulazzi Unit was the only other unit occupied during the relevant times, such as when A.L.M. would go to or from her school bus stop, which led him to suspect that Mulazzi and the Board (of which Mulazzi was a member) were involved. (Pls.' Statement ¶¶ 25-26; Fox Decl. ¶¶ 9-10.) In particular, Fox believed that Mulazzi used sounds and his windows to alert Elders when members of the Moore family were preparing to leave the Moore Unit. (Pls.' Statement ¶ 27; Fox Decl. ¶ 11.) To test this theory, Fox and Moore decided to see what would happen if they opened and shut a closet door near the front door to the Moore Unit, thereby creating

a sound akin to that created when someone leaves their home. (*Id.*) Accordingly, at different and staggered times over a three-day period, Moore opened and closed the closet door; each time he did so, Elders appeared outside the Moore Unit a short time later. (*Id.*)

Fox also advised Moore to maintain a log of any incidents that occurred. (Pls.' Statement ¶ 29; Fox Decl. ¶ 13; Bave Decl. Ex. C ("Moore's Log"), ECF No. 26-3.) This log contains descriptions of interactions with Elders, damages to packages, and other events that occurred between June 10, 2010 and April 26, 2012. (*See generally* Moore's Log.) Moore testified at his deposition that "approximately forty . . . incidents [in his Log] involve [A.L.M.]" (Pls.' Statement ¶ 48; S. Moore Dep. Tr. 89:9-90:3.) Moore's Log likewise indicates that, on August 20, 2010, Moore told local police that Elders had been harassing his family for nine months and expressed his belief that Mulazzi was involved in the harassment. (Moore's Log at 1; Def.'s Statement ¶ 9.)

As Mulazzi and the Board were suspects of Fox's investigation, Moore executed and gave Fox his proxy to attend Vireum's annual meeting on September 27, 2010. (Pls.' Statement ¶ 28; Fox Decl. ¶ 12; *id.* Ex. 1.) Upon arriving to the meeting and showing the proxy, however, the Board ejected him on the ground that only unit owners were allowed to attend an annual meeting. (*Id.*) Fox requested proof of such a policy but it was never provided. (*Id.*)

Moore and his family moved out of the Moore Unit in September 2012. (Def.'s Statement ¶ 3; S. Moore Dep. Tr. 8:25-9:8.) They subsequently decided to rent the Moore Unit and, in about May or June of 2013, Plaintiffs' property manager showed it to a prospective tenant who was a female "of the Black race." (Pls.' Statement ¶¶ 30, 50.) During this showing of the Moore Unit, Mulazzi opened a window in the Mulazzi Unit, which was above the door to the Moore Unit, and spoke to Plaintiffs' property manager. (Pls.' Statement ¶ 50; Def.'s Resp. Pls.' First. Req. for

Admis. at 7.) Sometime after this prospective tenant was shown the Moore Unit, but before Moore notified the Board of his intent to rent the Moore Unit to this person, the Board informed Moore that the Moore Unit could not be rented. (Pls.' Statement ¶ 30; *id.* Ex. 9.) The Board reasoned that the maximum number of rentals permitted by Vireum's regulations—25% of the building's units—had already been reached. (*Id.*) When asked for proof of such a regulation, the Board did not respond. (*Id.*)

On July 8, 2014, Moore emailed the Board to share his family's intent to move back into the Moore Unit. (Pls.' Statement ¶ 58; *id.* Ex. 24.) In that email, Moore also asked the Board to take steps to ensure that his wife would be left alone by Mulazzi and Elders, explaining that his wife was diagnosed with "Panic Disorder with agoraphobia, Posttraumatic stress disorder, and Obsessive-compulsive disorder" arising out of "the repetition of unwanted attention to her by [Mulazzi and Elders]" and the "package damage" that occurred during their previous occupancy of the Moore Unit. (*Id.*) On August 1, 2014, the Board responded to Moore's complaints, noting, among other things, that Elders was neither an owner nor a member of the Board and that his actions therefore did not fall under the Board's purview, and that the Board had not received any other complaints regarding damaged packages. (Pls.' Statement ¶ 34; *id.* Ex. 13.) The Board likewise stated that it "do[es] not ensure against the private actions of [its] members, [but would] take seriously any documented claims of improper behavior on the part of a [Board] member" and encouraged Moore to "notify the [B]oard and contact the proper authorities contemporaneously" should any further incidents occur. (*Id.*) Two days later, Moore requested that "the common area garden . . . maintained by [Elders] immediately adjacent to [the Moore Unit's] terrace and only door be either eliminated, or moved to another area far away from [the Moore Unit] . . . [so that] there will be no excuse for [Elders] to hang about [the Moore Unit's] door." (Pls.' Statement ¶ 61;

*id.* Ex. 27.) Moore explained that this request was based on a concern for his wife's medical condition, as well as the protection of A.L.M. (*Id.*) On August 16, 2014, Moore provided the Board with evidence relating to his complaints against Mulazzi and Elders, such as copies of police reports he filed, his Log, images of damaged packages, and his wife's medical records. (Pls.' Statement ¶ 60; *id.* Ex. 26 & 30.)

The Moores moved back into the Moore Unit at the end of August or beginning of September 2014 (Def.'s Statement ¶ 3; S. Moore Dep. Tr. 8:25-9:8). On September 2, 2014, Mulazzi e-mailed other members of the Board, writing: "Just FYI: Today [the Moores] moved a great deal of boxes and furniture into [the Moore Unit]. No issues as yet, but I will keep you all informed if I observe anything out of the ordinary. Mrs. Moore seems well, if a bit unsteady on her feet. All is quiet on the western front as of now." (Pls.' Statement ¶ 32; *id.* Ex. 11.) A few days after that, Moore e-mailed the Board to note that, when he was moving boxes and other items into the Moore Unit on September 1 or 2, 2014, he saw Mulazzi and Elders "standing together nearby in the lot, and talking together in an excited manner," and that when Elders saw Moore approaching, he said to Mulazzi, "[W]e'll talk again." (Pls.' Statement ¶ 33; *id.* Ex. 12.)

On September 5, 2014, Moore sent an email to the Board stating that, as he had yet to receive any "communication about any steps taken, or planned to be taken[,] by the [B]oard," he planned to "sue the [B]oard and the building for damages suffered by [his] wife, and for whatever actions a court may require to remedy the failing of the [B]oard." (Pls.' Statement ¶ 59; *id.* Ex. 25.)

Between the fall of 2014 and the summer of 2015, Moore sent the Board numerous e-mails complaining of interactions that he, his wife, and A.L.M. had with Elders, Mulazzi, and other

Vireum residents. (Def.'s Counterstatement ¶ 4; *id.* Ex. E; Pls.' Statement ¶¶ 33, 35-39, 56-57; *id.* Ex. 10, 12, 14-18.; Def.'s Ex. U ("Ryan Aff.") ¶¶ 3-4.) In one such e-mail, Moore reported: "A short time ago, 4:30 [p.m.,] I walked out with our 12 year old daughter and went across the street to . . . shoot basketball with her. No one was outside. When we returned 15 minutes later, Mulazzi was standing by our walkway and door, and we had to walk by him to our door. [Five] minutes after we walked inside, Mulazzi was nowhere to be seen." (Pls.' Statement ¶ 36; *id.* Ex. 15.) In addition, on March 24, 2016, Moore sent an e-mail to all Vireum unit owners, directing them to "[s]tay off of and away from [the Moore Unit's] private back walkway and terrace . . . so [Mrs. Moore's] medical condition can improve." (Def.'s Statement ¶ 18; *id.* Ex. S.)

In anticipation of a lawsuit against the Board, Moore began contacting former owners of Vireum units for information regarding acts committed by Mulazzi and Elders. (S. Moore Dep. Tr. 55:18-60:25.) Among the individuals Moore contacted was Kennedy, who was on the Board from 2005 until 2009. (*Id.* 56:3-7.) When Moore spoke to Kennedy in March 2015 (S. Moore Dep. Tr. 26:3-4), Kennedy relayed certain statements Mulazzi made during a Board meeting that took place in the fall of 2006, after Moore had left the Board. (Pls.' Statement ¶ 17; S. Moore Dep. Tr. 56:1-22.) Specifically, Kennedy said that Mulazzi announced his intent "to make [Moore's] family's life miserable using the proximity of his unit over [the Moore Unit]," for example, by "dragging chains across his floor so that the noise would bother [them]." (Pls.' Statement ¶ 17; S. Moore Dep. Tr. 56:3-17.) Kennedy further told Moore that "Mulazzi didn't care who heard him say [this]," and that Mulazzi's statements were "chilling for [Kennedy] to hear." (Pls.' Statement ¶ 17; S. Moore. Dep. Tr. 56:18-22.) In his affidavit, Mulazzi denied having made these statements. (Mulazzi Aff. ¶ 9.)

On November 23, 2015 and December 14, 2015, Moore sent correspondence entitled "Notice of Claim" to Vireum's insurance companies, Harleysville Insurance Company of New York and Traveler's Insurance Co. (Def.'s Statement ¶ 11; *id.* Ex. O & P.) These Notices of Claim sought, among other things, monetary compensation for aggravation of Moore's wife's mental health condition and for the interference with Moore's peaceful enjoyment of the Moore Unit. (*Id.*) At his deposition, Moore acknowledged that any stalking or interference of A.L.M. is not mentioned in either of these documents. (S. Moore Dep. Tr. 48:5-49:24.) Moore testified that, "in the bundle of claims that [the Moores] had and have, [his wife] was suffering the immediate effects from [the interference]," including her hospitalization. (S. Moore Dep. Tr. 48:5-14.) According to Moore, both claims were ultimately denied by the insurance companies on the basis that neither policy covered intentional acts. (*Id.* 48:14-17.)

A.L.M. testified at her deposition that she had personal knowledge of and recalled several of the incidents of interference alleged in the Complaint. (Pls.' Statement ¶ 40; Bave Decl. Ex. Q ("A.L.M. Dep. Tr.") 7:4-17, ECF No. 26-17.) For example, she testified that, on a daily basis, she would hear loud sounds coming from above the Moore Unit, like someone was "stomp[ing] . . . and . . . walk[ing] all over the ceiling," "drag[ging] things[,] or mov[ing] furniture." (Pls.' Statement ¶ 41; A.L.M. Dep. Tr. 7:18-9:11.) A.L.M. also recalled times when she would be getting off her school bus and Elders or Mulazzi would appear "in front of the walkway, or just in the way in general, and [she would] have to walk around them." (Pls.' Statement ¶ 43; A.L.M. Dep. Tr. 11:15-12:11.) During these interactions, Elders or Mulazzi would be four or five feet away—not "too close, but [close] enough" that "their presence" bothered her. (Pls.' Statement ¶ 43; A.L.M. Dep. Tr. 12:8-11.) However, A.L.M. testified that no one at Vireum ever said to her, "you're Chinese; you shouldn't live here." (Def.'s Statement ¶ 12; A.L.M. Dep. Tr. 13:23-14:3.) A.L.M.

added that, when she was about seven or eight years old, she would have occasional nightmares about Mulazzi and the other man who lived in the Mulazzi Unit. (Pls.' Statement ¶ 44; A.L.M. Dep. Tr. 14:4-23.)

Marilisa Moore testified at her deposition that she "was there during a lot of the intersecting behavior," including instances in which she was bringing A.L.M. to the bus and Elders or Mulazzi would appear. (Bave Decl. Ex. R ("M. Moore Dep. Tr.") 7:24-9:9, ECF No. 26-18.)[4] She believed this alleged harassment was initiated as a result of A.L.M.'s national origin because the behavior was not targeted at any other resident of the Vireum and everyone involved knew that A.L.M. was Chinese. (Def.'s Counterstatement ¶ 21; M. Moore Dep. Tr. 33:6-34:11.) However, she never heard Mulazzi speak to A.L.M. directly during these incidents. (Def.'s Counterstatement ¶ 22; M. Moore Dep. Tr. 35:10-14.) Marilisa Moore further testified that her family never identified the individual or individuals responsible for damaging their packages or other property. (Def.'s Statement ¶¶ 13-14; M. Moore Dep. Tr. 20:23-21:20).

Plaintiffs state that the Board never conducted a neutral and independent into Moore's reports of harassment of his family by Mulazzi and Elders, nor took prompt corrective action in response to such reports. (Pls.' Statement ¶¶ 56-57.) In support of this assertion, Plaintiffs point to an e-mail dated September 17, 2014, in which members of the Board discuss how to address a report from Moore that Elders was taking pictures of the Moore Unit. (*Id.* Ex. 10.) In this e-mail, Board member Ryan writes, "[Moore is] an attorney, he should take action on his own, he's trying to suck us in." (*Id.*) Defendant disputes this statement, asserting that it attempted to address

---

[4] Excerpts of Mrs. Moore's deposition transcript were also provided by Plaintiffs. (*See* Pls.' Mem. Opp. Def.'s Mot. Summ. J. Ex. 20 (is this the first time this was cited?).)

Plaintiffs' complaints through its attorney.[5] (Def.'s Counterstatement ¶ 6; *id.* Ex. F). The Board likewise notes that Mulazzi responded to Moore's complaints in e-mails to his fellow Board members (*id.* ¶ 7; *id.* Ex. G), as did other Board members, who were admittedly "less diplomatic" in their responses (*id.* ¶ 8; *id.* Ex. H.)

In his e-mails responding to Moore's complaints, Mulazzi wrote to the Board, among other things, that he had "no idea when [Moore] or his family leave or arrive" (Bave Decl. Ex. D at 6, ECF No. 32-5); he found it "unfortunate that [Moore] finds movements by persons who are owners here in the common areas offensive" (*id.* at 3); that he was entitled to "exit or enter the building at any time of the day or night as is permitted by any owner, resident, tenant or visitor" (*id.*); and that Moore "cannot control the movements of [owners] in the parking areas (*id.* at 1). In these e-mails, Mulazzi often admitted to the Board that he was in the common areas or leaving the Vireum at the times that Moore saw him, but maintained that his movements were for innocent reasons and rejected Moore's interpretation of the incidents. (*See generally id.* at 1-6.)

Mulazzi stated that he has not had any contact with the Moores since Moore was voted off the Board in 2006 and denied that he took any action or encouraged others to take any action with the intent to drive Plaintiffs out of the Moore Unit. (Def.'s Counterstatement ¶ 26; Mulazzi Decl. ¶ 8.)

Ryan stated that Moore never indicated to him before this lawsuit that any of the actions

---

[5] One e-mail from the Board's attorney to Moore writes: "As you know, the Board has no authority to prohibit residents from moving about their homes, using their vehicles, the common elements and/or the surrounding streets. If you believe that the use of common elements is done with an intent to commit unlawful or criminal act[s,] you have been advised, on numerous occasions, to report the activity to the proper authorities. Your email below describes the kind of activity that any unit is within his rights to engage in. It is your characterization that [Mulazzi] is 'stalking' your wife and that is an issue for the local authorities to determine and deal with." (*Id.* at 4.)

about which he complained over the years were motivated by A.L.M.'s Chinese background, and that the Vireum has had "residents of African-American, Japanese, Filipino, Chinese (in addition to [A.L.M.]) and Indian descent," with three current residents "of Asian descent." (*Id.* ¶¶ 8- 9.) Ryan further affirmed that he has never received a complaint from any other unit owner regarding noise from the Mulazzi Unit. (Ryan Decl. ¶¶ 5-6.)

On March 23, 2016, Moore refused to pay an invoice sent by the condominium association, stating that he had previously "notified the [B]oard that common charges [were] being withheld because of [his pending claims against the Board] and litigation, until and unless the [B]oard cure[d] [its] gross breach of the Vireum bylaws and of [its] fiduciary duty to protect [Moore's] bylaw rights as a unit owner." (Def.'s Counterstatement ¶ 9; *id.* Ex. I.)

Plaintiffs moved out of the Moore Unit for the second time in September 2016. (S. Moore Dep. Tr. 8:25-9:8.)

On August 29, 2017, Defendant's attorney sent Moore a letter informing him that Defendant was filing a "formal lien upon the [Moore Unit]," and that "in the absence of payment . . . [the Board would] initiate foreclosure proceedings without further notice to Moore." (Pls.' Statement ¶¶ 53-54 & Ex. 22; Def.'s Counterstatement ¶ 10; *id.* Ex. J.)

On September 27, 2017, Plaintiffs filed their Complaint in the instant action. (Compl., ECF No. 1.)

# LEGAL STANDARD

## I.    Summary Judgment

Summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, summary judgment will not lie where there is a "dispute[] over facts that might affect the outcome of the suit under the governing law" and "the evidence is such that a reasonable jury could return a verdict for the [non-moving] party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The Supreme Court has made clear that 'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter[.]'" *Westinghouse Elec. Corp. v. N.Y.C. Trans. Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990) (quoting *Anderson*, 477 U.S. at 249). Rather, the relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. Moreover, in deciding a motion for summary judgment, courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in its favor." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (internal citation and quotation marks omitted).

The moving party bears the initial burden of pointing to evidence in the record "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may also support an assertion that there is no genuine dispute by showing "that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the non-moving party to identify "specific facts showing that there is a genuine issue for trial."

*Anderson*, 477 U.S. at 248 (internal citation and quotation marks omitted).

The party asserting that a material fact is genuinely disputed must support his or her assertion by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999). In addition, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson v*, 477 U.S. at 252.

## DISCUSSION

### I. Plaintiffs' Claims Under the FHA

#### A. Applicable Law

Section 3604 of the FHA makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services in connection therewith, because of race, color . . . or national origin." 42 U.S.C. § 3604(b). In addition, Section 3617 makes it unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of . . . any right granted or protected by" Section 3604. *Id.* §3617. Courts within this Circuit have held that Section 3617 "can, at times, serve as a separate basis for an FHA claim even where there is no predicate for liability under any of the statute's specifically referenced enumerated provisions." *Lachira v. Sutton*, 2007 WL 1346913 at *17 (D. Conn. May 7, 2007). Collectively, these provisions are designed "to eliminate all traces of

discrimination within the housing field." *Cabrera v. Jakabovitz*, 24 F.3d 372, 390 (2d Cir. 1994) (quotation marks omitted).

## B.     Discussion

Plaintiffs claim that Mulazzi and/or Elders engaged in discrimination based on A.L.M.'s race, age, sex, and national origin insofar as they attempted to drive the Moores out of the Vireum by making noise in the Mulazzi Unit and "intersecting" members of the Moore family when they left their home.[6] Plaintiffs further contend that the Board is liable for Mulazzi's discriminatory practices and its subsequent "ratification" of such practices, as well as for failing to investigate or end the harassment of both Mulazzi, its agent, and Elders, a Vireum tenant.

Thus, Plaintiffs' claims involve three questions that remain unresolved in this Circuit: whether post-acquisition harassment is actionable under Section 3617, whether the Board may be liable under Section 3617 for failing to redress tenant-on-tenant harassment, and whether the Board's knowing or negligent failure to intervene to combat such harassment, without discriminatory intent, is actionable against the Board.[7] *See Francis v. Kings Park Manor, Inc.*, 91 F. Supp. 3d 420, 432 (E.D.N.Y. 2015), *aff'd in part, vacated in part, remanded*, 917 F.3d 109 (2d

---

[6] Plaintiffs additionally point to the damage done to their packages, car, and other property as evidence of a hostile housing environment. However, the fact that Plaintiffs' personal property was allegedly tampered with cannot support Plaintiffs' case, as nothing in the record ties such damage to Defendant, Mulazzi, or Elders. Indeed, Moore's wife testified that her family never discovered the identity of the individual or individuals responsible for the damage.

[7] Plaintiffs appear to believe that these questions are answered by certain rules promulgated by the Department of Housing and Urban Development. (*See generally* Pls.' Mem. Supp. Mot. Cross-Summ. J., ECF No. 53 (relying extensively on 24 C.F.R. §§ 100.6 and 100.7); *see also* Pls.' Mem. Opp. Def.'s Mot. Sanctions at 6-7, ECF No. 43 (arguing that Defendant's summary judgment motion papers "wholly misrepresented the housing discrimination laws by failing to present the [FHA] implementing regulations [24 C.F.R. §§ 100.6 and 100.7].") At most, these regulations are entitled to deference under *Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837 (1984). In any case, even assuming these rules are binding on this Court, Plaintiffs' claims are unsuccessful for the reasons described in this Opinion.

Cir. 2019), *opinion withdrawn*, 920 F.3d 168 (2d Cir. 2019). Whatever the answers to these open questions, however, Plaintiffs' FHA claims still fail for the reasons that follow.

District courts in this Circuit have held that a plaintiff bringing a post-acquisition hostile housing environment claim under Section 3617 must prove (1) that he or she was subjected to harassment that was sufficiently pervasive and severe so as to create a hostile housing environment; (2) that the harassment was because of the plaintiff's membership in a protected class; and (3) that a basis exists for imputing the allegedly harassing conduct to the landlord or property manager.[8] *See, e.g., Pierre v. Lantern Grp. Found., Inc.*, 14-cv-8449 (JMF), 2016 WL 3461309 at *2 (S.D.N.Y. June 20, 2016); *D.K. by L.K. v. Teams*, 260 F. Supp. 3d 334, 367 (S.D.N.Y. 2017); *Cain v. Rambert*, 2014 WL 2440596 at *5 (E.D.N.Y. May 30, 2014).

In this case, Plaintiffs have not shown that a hostile environment existed. As noted, the only conduct that may be attributed to the Board, one of its agents, or a Vireum resident is the noise coming from the Mulazzi Unit and the intersecting behavior, *i.e.*, the presence of residents near members of the Moore family or their unit. A reasonable person would not view this conduct as sufficiently severe or pervasive. Moreover, Plaintiffs state that the harassment began almost immediately upon moving into the Vireum in 2005, but they did not move out of the Vireum until 2012, and then moved back into the Vireum two years later. Thus, while they did vacate the Vireum twice, the Moores also remained at the Vireum for a total of about nine years. This suggests that,

---

[8] As the scope of this third element has not yet been defined by the Second Circuit, the Court assumes for purposes of this motion that the conduct of Mulazzi or Elders may be imputed to the Board based on the Mulazzi's status as an agent of the Board and/or the Board's failure to stop the alleged harassment by Plaintiffs' neighbors. *See, e.g., Reeves v. Carrollsburg Condo. Unit Owners Ass'n*, No. 96–CV–2495, 1997 WL 1877201, at *7 (D.D.C. Dec. 18, 1997) (finding that a defendant condominium association could be held liable for creation of a hostile housing environment where the defendant "knew or should have known of the harassment, and took no effectual action to correct the situation.").

even from the Moores' perspective, the unwelcome conduct was not sufficiently severe or pervasive.

Furthermore, the record is devoid of evidence that the acts arose from a discriminatory motive. Plaintiffs argue that Mulazzi's and Elders' discriminatory intent can be reasonably inferred because (1) Mulazzi made faces at A.L.M. on two occasions shortly after the Moores moved into the Vireum in 2005; (2) in announcing to the Board in 2006 his plan to make the Moores' lives miserable, Mulazzi identified the Moore "family" as the target of his harassment, rather than just Moore individually;[9] and (3) A.L.M. or the members of her family were the only residents enduring the noise and the intersecting behavior. But these conclusory assertions, without more, cannot give rise to a reasonable inference of discriminatory animus. *See, e.g.*, *Haber v. ASN 50th St. LLC*, 847 F. Supp. 2d 578, 586 (S.D.N.Y. 2012) (finding plaintiff's "own conclusory assertions that [the defendants] acted for racially motivated reasons[,]" for example, plaintiff's statement that "people 'wouldn't do this' unless they were racially motivated[,]" insufficient to demonstrate discrimination).

Nor do the facts in the record allow for such an inference. Not one of Moore's Log entries or e-mails to the Board suggests that he or a member of his family believed the harassment was related to A.L.M.'s protected status;[10] A.L.M. testified that neither Mulazzi nor Elders ever said

---

[9] Defendant objects to the Court's consideration of this statement on the ground that it is inadmissible hearsay because Moore had no personal knowledge of the statement to which he testified. Plaintiffs respond that this statement is admissible hearsay as a statement of the declarant's, *i.e.,* Mulazzi's, then-existing state of mind. While this may be true as to Mulazzi's statement, Plaintiffs overlook the fact that this evidence involves two layers of hearsay—the second layer being Kennedy's statement to Moore in 2015 in which he relayed this information. Without an exception to account for this double hearsay, the evidence is inadmissible. In any case, because this statement serves neither to defeat Defendant's motion for summary judgment nor support Plaintiffs' cross-motion for summary judgment, the Court includes it in its discussion.

[10] In fact, Moore's e-mails to the Board focus almost exclusively on his wife's mental health.

anything to her, particularly about her racial background; and Moore's notice of claims to the Vireum's insurers only mention his wife's mental health. Furthermore, Ryan affirmed that the Vireum has had residents from many different backgrounds, that he has never received a complaint from any other unit owner regarding noise from the Mulazzi Unit, and that, until this lawsuit, Moore never indicated to him that any of the actions were motivated by A.L.M.'s ethnic background. In sum, Plaintiffs have proffered no evidence that any of the complained-of actions arose from a discriminatory motive as opposed to a neutral motive, such as a personal feud between neighbors. *Cf. United States v. Weisz*, 914 F. Supp. 1050, 1054 (S.D.N.Y. 1996) (granting motion to dismiss where allegations "recite[d] nothing more than a series of skirmishes in an unfortunate war between neighbors"); *Lachira v. Sutton*, 2007 WL 1346913 at *20 (D. Conn. May 7, 2007) (granting motion for summary judgment where the conduct at issue was "more akin to a 'quarrel' between a tenant and her landlord than the 'pattern of harassment' found to be actionable [under Section 3617]"). Accordingly, any claim against the Board based on the conduct of Mulazzi as its agent cannot withstand a motion for summary judgment.

Moreover, in the absence of any discriminatory intent on the part of Mulazzi or Elders, Plaintiffs' claims against the Board for allegedly ratifying and failing to intervene in their harassment necessarily fail, given that the Board could not have approved of or tried to address discriminatory harassment that never existed in the first place. *See Cain*, 2014 WL 2440596 at *6 (dismissing claim against landlord for failing to intervene in alleged harassment from plaintiff's neighbors where plaintiff failed to plausibly state a claim of discriminatory harassment against those neighbors).

But even if one could objectively view Mulazzi's or Elders' actions as discriminatory harassment, Plaintiffs' claims remain unavailing because they have not demonstrated that the Board ratified or failed to intervene in such discrimination. When Moore e-mailed the Board about the perceived harassment, he primarily complained of residents' presence in the common areas of the garden or the public sidewalk near the Moore Unit and the effect that this activity was having on his wife's mental health. In response, the Board sent a notice to all residents regarding respect for other residents' quiet enjoyment of their units, banned Elders from the garden areas near the Moore Unit and fined the owner of Elders' unit when he violated this rule, and reached out to Mulazzi about Moore's complaints. Mulazzi in turn explained to the Board the nature of his conduct, denied any intent to harass the Moores, and insisted that he had a right to access the common areas of the property without being accused of harassment. Thus, contrary to Plaintiffs' assertions, the evidence illustrates that the Board did in fact take steps to investigate and address Moore's complaints.[11] Indeed, given the nature of the perceived harassment and the location of the Moore Unit—on the ground floor, abutting one of the Vireum's parking lots, a public walkway, and a common area garden—it is difficult to imagine what else the Board might have done to address Moore's grievances without compromising the ability of other residents to access their units and enjoy the benefits of the common areas.[12] As such, the evidence indicates that, after receiving Moore's complaints, the Board addressed the perceived harassment of its agent, Mulazzi, and tenant, Elders.

---

[11] This is true notwithstanding the fact that some internal e-mails among Board members suggest a growing impatience with Moore's complaints regarding the presence of residents near the Moore Unit or members of the Moore family.

[12] Plaintiffs have not argued that the Board should have, or even had the power to, evict any tenants; they only contend that the Board failed to conduct a neutral and independent investigation.

Plaintiffs also argue that the Board itself facilitated or ratified the discrimination, as demonstrated by the fact that the Board failed to investigate Moore's complaints, ejected Fox from a Board meeting in September 2010, neglected to maintain meeting minutes after 2006, and refused to permit the Moore Unit's rental to an African-American tenant because of a cap on the number of rentals at a time. However, the record shows that the Board *did* investigate Moore's complaints, as previously discussed, and the remaining facts are insufficient to support Plaintiffs' claims because there is no evidence that these policies were enforced for some unlawful reason rather than a lawful one. For example, while there have always been and continue to be owners and residents of different backgrounds at the Vireum, nothing indicates that these policies were not applicable to Vireum residents of a different race, sex, or age. *See Haber*, 847 F. Supp. 2d at 588 (plaintiff failed to show uninvited contractor was allowed into his apartment because of his race where nothing in the record suggested that plaintiff "was being treated differently from tenants of any other race"). Accordingly, no rational finder of fact could find that the Board ratified the conduct of Mulazzi or Elders or otherwise facilitated discrimination of Plaintiffs based on A.L.M.'s protected status.

To summarize, Plaintiffs have failed to establish that a hostile housing environment existed; that Mulazzi or Elders acted with any discriminatory animus; or that the Board is liable for the individuals' actions, whether on a theory of vicarious liability or failure to intervene. Defendant's motion for summary judgment as to Plaintiffs' FHA claims is therefore granted.

## II.     Plaintiffs' Claims Under 42 U.S.C. §§ 1981 and 1982

### A.     Applicable Law

Section 1981 provides in pertinent part that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens[.]" 42 U.S.C. § 1981(a). "[T]he term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b). Section 1982 similarly provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." *Id.* § 1982. To establish a claim under Sections 1981 and 1982, a plaintiff must prove the following elements: (1) the plaintiff is a member of a . . . minority; (2) the defendant acted with the requisite intent to discriminate on the basis of [the plaintiff's protected status]; and (3) the discrimination concerned one or more of the activities enumerated in the statute. See *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993). Additionally, "a plaintiff does not have to be a member of the . . . minority to bring a claim under these statutes, but can be a plaintiff alleging a personal injury derivative of defendant's discriminatory actions against a . . . minority." *Puglisi v. Underhill Park Taxpayer Assoc.*, 947 F. Supp. 673, 700 (S.D.N.Y. 1996).

## B.     Discussion

As with Plaintiffs' claims under the FHA, Plaintiffs' claims under Sections 1981 and 1982 fail. Plaintiffs have not presented evidence sufficient to conclude that A.L.M.'s race, national origin, sex, or age was a motivating factor in any of the actions at issue, or that the Board failed to adequately intervene in the perceived discrimination.

## III.    Sanctions

### A.    Applicable Law

Federal Rule of Civil Procedure 11, which confers on a district court authority to sanction a litigant or its counsel, provides, in relevant part:

> By presenting to the court a pleading, written motion, or other paper . . . an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; and
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing law or for establishing new law.
>
> Fed. R. Civ. P. 11(b).

Rule 11(c)(2) provides for a "safe harbor" that gives the offending attorney or litigant an opportunity to withdraw or correct a challenged submission so as to avoid sanctions. Under this safe harbor provision, a motion for sanctions must initially be served only on the offending party. *In re Pennie & Edmons LLP*, 323 F.3d 86 (2d Cir. 2003). If the challenged submission has not been "withdrawn or appropriately corrected" by the offending party within 21 days of such service, the motion for sanctions may be filed with the Court. *Id.* A court may only sanction an attorney or litigant that violates Rule 11(b) if these procedural requirements have been satisfied. *See Lawrence v. Richman Group of CT LLC*, 620 F.3d 153, 156 (2d Cir. 2010) ("A court may sanction an attorney, law firm, or party that violates Rule 11(b), but only after providing notice and reasonable opportunity to respond.") (citing Fed. R. Civ. P. 11(c)(1)).

"When considering whether to impose monetary sanctions based on meritless pleadings,

'[t]he operative question is whether the argument is frivolous, i.e., the legal position has 'no chance of success,' and there is 'no reasonable argument to extend, modify or reverse the law as it stands.'" *Ferguson v. Comm'r of Tax & Fin.*, 739 F. App'x 19, 22 (2d Cir. 2018) (quoting *Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 177 (2d Cir. 2012)). In addition, "[i]n deciding whether the signer of a pleading, motion, or other paper has crossed the line between zealous advocacy and plain pettifoggery, the court applies an objective standard of reasonableness." *United States v. Int'l Bhd. of Teamsters*, 948 F.2d 1338, 1344 (2d Cir. 1991) (citation omitted); *see also McCabe v. Lifetime Entm't Servs.*, 761 F. App'x 38, 41 (2d Cir. 2019) ("Rule 11 requires that the conduct in question be objectively unreasonable and therefore does not require a finding of subjective bad faith."). Finally, while courts have "broad discretion in determining whether to impose sanctions under Rule 11," *In Re Welspun Litig.*, 16-cv-6792 (VB), 2019 WL 2174089, at *6 (S.D.N.Y. May 20, 2019) (citation omitted), such sanctions should "be imposed carefully lest they chill the creativity essential to the evolution of the law," *Greenberg v. Churst*, 297 F. Supp. 2d 699, 703 (S.D.N.Y. 2004) (citations omitted).

## B.    Discussion

Defendant has moved for an award of sanctions under Rule 11 against A.L.M. and Moore, both in his capacity as one of the Plaintiffs and as Plaintiffs' counsel in this matter. (Def.'s Mem. Supp. Mot. Sanctions, ECF No. 33.) Plaintiffs, for their part, have argued that Defendant failed to comply with the procedural requirements set forth in Rule 11(c), that the motion is frivolous, and that, if Defendant "does not voluntarily withdraw this frivolous motion, the Court should consider sanctions against [Defendant] and its counsel under Rule 11(c)(3)." (Pls.' Mem. Opp. Def.'s Mot. Sanctions at 1, 6, ECF No. 43.)

Contrary to Plaintiffs' assertions, Defendant did in fact comply with Rule 11's safe harbor provision. During a conference on May 16, 2018, at which both parties were present, Defendant requested leave to file a motion for sanctions against Plaintiffs.[13] (Def.'s Reply Mem. Supp. Mot. Sanctions, Ex. A 15:13-15.) The Court granted this request and stated that such a motion could be filed at the same time as Defendant's motion for summary judgment, *i.e.*, on September 7, 2018. (*Id.* 15:16-25) The Board served Plaintiffs with the motion for sanctions on June 14, 2018 (Def.'s Reply Mem. Supp. Mot. Sanctions, Ex. B), and did not file the motion with this Court until September 7, 2018 (Def.'s Mot. Sanctions, ECF No. 31).

However, Defendant's motion for sanctions fails on the merits. Although Plaintiffs' claims did not withstand summary judgment, it was not "patently clear" that their claims had "absolutely no chance of success[.]" *Eastway Constr. Corp. v. City of N.Y.*, 762 F.2d 243, 254 (2d Cir. 1985). Nor is the Court convinced that A.L.M. or Moore acted for an improper purpose in bringing this litigation. The Court is equally unpersuaded by Plaintiffs' argument that Defendant's Rule 11 motion is a "bad faith attempt to chill enforcement of the housing discrimination laws." (Pls.' Mem. Opp. Def.'s Mot. Sanctions at 7.)

As such, the Court declines to impose sanctions against either party.

## CONCLUSION

Based on the foregoing conclusions, Defendant's Motion for Summary Judgment is GRANTED, Plaintiffs' Cross-Motion for Summary Judgment is DENIED, and Defendant's

---

[13] Plaintiffs note that Defendant did not submit a pre-motion letter with the Court describing its intent to file a Rule 11 motion. (Pls.' Mem. Opp. Def.'s Mot. Sanctions at 6, ECF No. 43.) While this may be true, as already noted, Plaintiffs did share with the Court of its plan to file the Rule 11 motion during the May 16, 2018 conference (Def.'s Reply Mem. Supp. Mot. Sanctions, Ex. A 15:13-25).

Motion for Sanctions is DENIED. The Clerk of the Court is respectfully directed to terminate the motions at ECF Nos. 25, 31, and 50, and to close the case.

Dated: August 2, 2019
White Plains, New York

SO ORDERED:

_____
NELSON S. ROMÁN
United States District Judge